UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HILLARY BRODY,

     Plaintiff,

                                  Civil No. 20-_____

v.

                                  Honorable _____

CULTURESOURCE,
COSTAFF H.R. SERVICES, INC.,
and WILLIAM OMARI RUSH,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Hillary Brody, by and through her counsel, Weininger Law PLLC, and for her causes of action against Defendants CultureSource, CoStaff H.R. Service, Inc. ("CoStaff"), and William Omari Rush, states the following:

### Parties

1.    Plaintiff is an individual residing in the City of Huntington Woods, County of Oakland, State of Michigan.

2.    Defendant CultureSource is a domestic nonprofit corporation operating within the Eastern District of Michigan. CultureSource is a member association serving non-profit arts and cultural organizations in southeast Michigan.

3.     Defendant CoStaff is a domestic profit corporation operating within the Eastern District of Michigan. According to its website, CoStaff is one of Michigan's largest Professional Employer Organizations (PEOs), servicing clients throughout southeast Michigan, across the state, and around the country.

4.     Upon information and belief, Defendant Rush is an individual residing in the City of Ann Arbor, County of Washtenaw, State of Michigan. Mr. Rush is the Executive Director of CultureSource.

## Jurisdiction

5.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental).

6.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims asserted in this lawsuit occurred in this District.

## General Allegations

7.     Plaintiff began working at CultureSource in May 2015 as an independent contractor. Her title was Marketing and Communications Manager and her duties included publishing newsletters, writing articles, assigning stories to freelance writers, managing CultureSource's social media accounts, and maintaining its website.

2

8.     Throughout 2016, Plaintiff's responsibilities increased significantly based on her successful performance. For instance, beginning in early 2016, her additional duties included, among others, managing the redesign of the CultureSource website and managing community partnerships with external organizations.

9.     In April 2016, CultureSource's then-Executive Director, Pamela Iacobelli, reclassified Plaintiff as an employee, entitling her to benefits, and increased her compensation by approximately 30%. Plaintiff's reclassification paperwork, including her job status change form, her open enrollment form, her direct deposit form, and her flexible spending account enrollment form, bears only the CoStaff logo and not the CultureSource logo. Plaintiff's Form MI-W4 (Employee's Michigan Withholding Exemption Certificate) lists solely "CoStaff HR Services, Inc." as her employer, and provides CoStaff's Federal Employer Identification Number. Plaintiff's open enrollment form instructs her to "Call CoStaff at 1-866-4-COSTAFF with any questions." CoStaff was the sole entity that direct-deposited Plaintiff's salary into her bank account during her employment.

10.     At the beginning of 2017, Ms. Iacobelli promoted Plaintiff to Brand & Community Strategist, a title more closely aligned with her expanded job responsibilities.

11.     At around the same time, CultureSource entered into a Client Services Agreement with CoStaff under which CoStaff agreed to co-employ CultureSource employees, who are defined in the Agreement as "Worksite Employees."

12.     The Client Services Agreement provides: "In the relationship between CoStaff, Client [i.e., CultureSource], and the Worksite Employees, there exists a co-employment relationship in which both CoStaff and Client have an employment relationship with Worksite Employees." Under the Agreement, CoStaff can, in consultation with CultureSource, hire, fire, promote, reassign, and discipline Worksite Employees. In addition, CoStaff has the "independent right" to terminate the employment of any Worksite Employee "without direction or request from" CultureSource.

13.     In March 2017, Ms. Iacobelli left CultureSource, leaving the Executive Director position vacant. Immediately after Ms. Iacobelli's departure, Plaintiff became progressively more involved in the development of CultureSource's public-facing programs while continuing to perform her pre-existing responsibilities.

14.     Defendant Rush became CultureSource's new Executive Director on September 25, 2017. With his arrival, Plaintiff continued to perform all of her previous duties and responsibilities, including the additional duties that she voluntarily assumed in the six-month period in which CultureSource did not have an Executive Director.

15.   In the summer of 2018, Mr. Rush encouraged Plaintiff to apply to participate in the prestigious Michigan Council for Arts and Cultural Affairs ("MCACA") "Rising Leaders Program." The Rising Leaders Program is "a rigorous and highly interactive personal development initiative committed to the advancement of Michigan's arts leaders" where "participants from across the state of Michigan gain tools and perspective needed to strengthen their leadership skills and develop relationships with an extraordinary cohort of peers dedicated to advancing the arts and culture field." Admission into the Rising Leaders Program is highly competitive; Mr. Rush volunteered to, and did, write a letter of recommendation on behalf of Plaintiff supporting her candidacy. Plaintiff was accepted into, and attended, the program (at CultureSource's expense), which ran from October 2018 to April 2019.

16.   In December 2018, upon learning of the resignation of a female employee who had a child with special needs, Mr. Rush commented that he now had the opportunity to hire a replacement who would have a more flexible work schedule and who would be unencumbered by childcare obligations.

17.   In January 2019, in recognition of Plaintiff's successful performance, Mr. Rush changed Plaintiff's job title to Director of External Relations. In this role, Plaintiff continued performing all of her pre-existing responsibilities in marketing and communications, website and social media management, and external and

community partnerships, but assumed an additional duty – writing CultureSource's grant applications.

18.    The new grant-writing responsibility was crucial to CultureSource's viability and success because CultureSource is more than 80% grant-funded.

19.    When Plaintiff's title changed in January 2019, Mr. Rush told Plaintiff that she would receive a pay raise to account for the responsibilities that she amassed since her last pay increase, which included her new grant-writing duties.

20.    After approximately one month without receiving the promised pay raise, Plaintiff, in or around February 2019, inquired about the raise during a private discussion with Mr. Rush. Mr. Rush again represented to Plaintiff that she would receive a pay raise, and additionally promised Plaintiff that the raise would be retroactive to the beginning of 2019.

21.    Relying upon Mr. Rush's promise of a retroactive salary increase, Plaintiff continued to perform her responsibilities, including CultureSource's grant writing. At this time, Plaintiff and Mr. Rush had an excellent working relationship and it did not occur to Plaintiff that Mr. Rush might never implement the promised retroactive pay raise.

22.    In the spring of 2019, Mr. Rush asked Plaintiff to attend a conference in California presented by the California Lawyers for the Arts. Mr. Rush told Plaintiff that he wished for her to attend the conference, which focused on arts in the

prison system, so that she could: (i) learn about a topic that Mr. Rush deemed highly important to certain foundations and strategic partners with whom CultureSource works; and (ii) utilize the knowledge gained at the conference to build and strengthen relationships with those foundations and strategic partners. Plaintiff attended the conference in Santa Clara, California from June 25-28, 2019, at CultureSource's expense.

23.    In July 2019, CultureSource and CoStaff implemented a new Employee Handbook ("New Handbook") to replace the prior Employee Handbook ("Old Handbook").

24.    Both the Old Handbook and the New Handbook are titled "CultureSource & CoStaff H.R. Services, Inc. Employee Handbook," and bear the logos of both CultureSource and CoStaff on the cover page.

25.    The New Handbook, like the Old Handbook, indicates that CoStaff is a co-employer of CultureSource employees and has the ability to, independently or in conjunction with CultureSource management, control the employment of Worksite Employees. For instance, the introductory pages of both the Old and New Handbooks are co-signed by CultureSource's Executive Director and CoStaff's CEO. Both Handbooks expressly define "the Company," a term used throughout the Handbooks, as both CoStaff and CultureSource. Where the Old and New Handbooks do not use the phrase "the Company" to describe the identity of the employer, they

use the phrase "CultureSource/CoStaff." The introduction pages in both Handbooks say "Welcome to CultureSource and CoStaff HR Services, Inc.!" and state that "CultureSource and CoStaff HR Services, Inc. work very closely together to provide a pleasant and harmonious working environment." Both Handbooks state that the policies and practices in the Handbook may be amended with the written approval or either CoStaff's CEO or CultureSource's Executive Director.

26.     Both the Old and New Handbooks direct Worksite Employees to contact either CultureSource or CoStaff with any questions about any practices, policies, or procedures in the Handbooks.

27.     The New Handbook changed the COBRA policy applicable to Worksite Employees. Both the Old Handbook and the New Handbook contain a section discussing COBRA rights, including a general description of what COBRA is and what constitutes a COBRA "qualifying event." The Old Handbook included caveats providing that "CULTURESOURCE is NOT an eligible employer," and "CULTURESOURCE . . . is NOT an eligible employer due to the staff size." However, the New Handbook entirely omitted these caveats, thereby indicating that COBRA is available to employees under the COBRA policy in the New Handbook.

28.     The New Handbook includes a new medical leave policy ("New Leave Policy"). The New Leave Policy authorizes eligible employees "who are temporarily

unable to work due to their own or an immediate family member's serious health condition or disability" to take a "leave[] of absence without pay."

29.    One significant job benefit that Plaintiff enjoyed was that CultureSource and CoStaff paid (and, upon information and belief, continue to pay) the full cost of employee health insurance benefits (i.e., the entire premium); employees pay nothing for health insurance.

30.    The New Leave Policy provides that, if an eligible employee wishes to retain group health insurance coverage while on medical leave pursuant to the New Leave Policy, the employee must pay the full cost of health insurance benefits beginning the month after medical leave is commenced.

31.    The Old Handbook did not include the provision discussed in the preceding paragraph. Rather, the medical leave policy in the Old Handbook was titled "Family and Medical Leave of Absence." The language of the policy, consistent with its title, tracks the requirements of the FMLA and repeatedly refers to the medical leave that is available under the policy as "FMLA leave."

32.    The policy in the New Handbook requiring employees who take medical leave to pay the full cost of their health insurance while on medical leave penalizes employees who take medical leave due to the employee's serious medical condition/disability or an immediate family member's serious medical condition/disability. It does so by requiring employees to go from paying nothing

9

for health insurance to paying the full cost of health insurance – a significant penalty imposed upon employees solely because they take medical leave in their time of need and at a time when they are not being paid.

33.    The policy revoking employer-paid health insurance benefits while employees are on medical leave violates the FMLA, which requires employers to maintain the health insurance coverage of an employee taking medical leave at the same level throughout the period of leave as the level immediately before leave was taken. *See* 29 U.S.C. § 2614(c)(1); 29 C.F.R. § 825.100(b).

34.    The New Leave Policy is facially discriminatory towards employees with disabilities and employees who have a disabled immediate family member. At a minimum, the policy has a disproportionate negative impact on employees with disabilities and employees who have a disabled immediate family member. The policy imposes a penalty on employees who wish to maintain their health insurance solely because a serious health condition or disability prevents them from working or they need to care for an immediate family member with a serious health condition or disability.

35.    The New Leave Policy has a disproportionate negative impact on women given the frequency with which medical leave is taken due to maternity leave and the fact that the vast majority of CultureSource employees are, and historically have been, women. For instance, upon information and belief, five of

CultureSource's seven current employees (not including CoStaff employees who work for CultureSource) are women. In fact, women predominate the arts and culture workforce.

36.     Mr. Rush introduced the New Handbook to employees via an email dated July 8, 2019. In addition to attaching a copy of the New Handbook to the email, Mr. Rush attached a memo dated July 3, 2019 to the email specifically directing attention to the New Leave Policy and referencing "maternity and paternity leaves" as a common type of medical leave contemplated under the policy. Mr. Rush encouraged employees to provide feedback on the policy changes.

37.     The July 3, 2019 memo states that Mr. Rush had "been meeting with CoStaff to update our staff handbook" since "early-May."

38.     After introducing the New Handbook, Mr. Rush asked all employees to sign an acknowledgement indicating that they received and read the New Handbook.

39.     Having recently learned that she was pregnant and concerned about a medical leave policy that penalizes maternity leave by shifting the full cost of health insurance from the employer to the employee while an employee is on unpaid medical leave, Plaintiff respectfully asked Mr. Rush if they could discuss the New Handbook prior to her signing the handbook acknowledgment.

40.     Plaintiff and Mr. Rush discussed the New Handbook during a private meeting on July 19, 2019. Plaintiff opposed the New Leave Policy and, specifically,

11

the aspect of the policy eliminating employer-paid health insurance benefits for employees who take medical leave. Plaintiff respectfully told Mr. Rush that the New Leave Policy is not inclusive of women employees who would need to take medical leave due to pregnancy and childbirth. She conveyed her belief that the New Leave Policy has a disproportionate negative impact on pregnant women and deprives pregnant employees, and any employee who has a serious medical condition or disability such as cancer, of an important job benefit (i.e., employer-paid health insurance) in their time of medical need and when they are already not being paid their salary.

41.     One of CultureSource's written "Guiding Principles" requires the organization to "speak . . . inclusively," a principle that is understood within the organization to prohibit the exclusion of any person or group based on a particular protected characteristic and to promote diversity, equity, and inclusion. "Inclusion" is also a component of CultureSource's "Strategic Blueprint."

42.     Immediately after the July 19 meeting, Mr. Rush began to act differently toward Plaintiff. Through no action or fault of her own, Plaintiff's individual, one-on-one interactions with Mr. Rush decreased in frequency, duration, collegiality, and productivity. For instance, before the July 19 meeting, Mr. Rush would approach Plaintiff to ask her about the status of her projects. After the meeting, he no longer did so. In addition, before the July 19 meeting, Plaintiff and

Mr. Rush often discussed arts and cultural events taking place in the community and publications that the two had read pertaining to arts and culture. Those conversations no longer occurred after the July 19 meeting. And on multiple occasions after the meeting, Plaintiff attempted to share updates with Mr. Rush about the status of her projects (e.g., "Culture Pop" and "Mural Arts"), but Mr. Rush gave only a cursory reply such as "okay" or "thanks," at which point the interaction would abruptly end. Before the July 19 meeting, similar status updates resulted in more prolonged and productive dialogue involving a meaningful exchange of ideas.

43.    Immediately after the July 19 meeting, Mr. Rush appeared to no longer appreciate Plaintiff's work or her contributions to the organization.

44.    A few weeks after the July 19, 2019 meeting, Mr. Rush did not show up to a scheduled meeting with Plaintiff regarding website updates and did not inform Plaintiff that he would not be attending the meeting – leaving Plaintiff waiting, to no avail, for Mr. Rush to arrive. Mr. Rush was never discourteous to Plaintiff before the July 19 meeting.

45.    On or about July 29, 2019, Mr. Rush and Plaintiff met for Plaintiff's "mid-year check-in" performance review. The two discussed the duties that Plaintiff had been performing and areas on which Plaintiff would focus going forward.

46.    In addition, because the retroactive pay increase that Mr. Rush had promised Plaintiff earlier in 2019 had still not been implemented, Plaintiff raised the

issue with Mr. Rush during the July 29 meeting. Plaintiff reminded Mr. Rush about their prior conversations earlier in the year in which Mr. Rush promised to award a pay increase to Plaintiff retroactive to the beginning of the year. In response, Mr. Rush told Plaintiff that he would address her pay raise in a follow-up memo that she would receive within one week.

47.    Plaintiff never received the promised follow-up memo or the retroactive pay increase.

48.    On August 28, 2019, Mr. Rush summoned Plaintiff to a meeting. Shortly after the meeting began, Mr. Rush informed Plaintiff that her position was being eliminated effective immediately. Mr. Rush explained that Plaintiff "does too much" and that he wished to create new positions that are "laser-focused" in specific areas. The specific areas in which Mr. Rush wanted to be "laser-focused" had been part of Plaintiff's responsibilities for years and were areas in which Plaintiff was knowledgeable and excelled. In fact, Plaintiff never received negative performance feedback at any point in time during her employment, including during Mr. Rush's tenure as Executive Director.

49.    After informing Plaintiff that her position was being eliminated because she "does too much," Mr. Rush instructed Plaintiff to pack up her possessions, followed Plaintiff to her office, and hovered over her, watching as she hurriedly, distraughtly packed her possessions into a box. When Plaintiff was still packing after

approximately ten minutes, Mr. Rush, still watching her, told Plaintiff that she could have only another five minutes to pack and that anything that she was unable to pack in the next five minutes would be mailed to her.

50.     While Plaintiff was packing her possessions, Plaintiff asked Mr. Rush if he had considered asking her to focus solely on the areas in which he wanted to be "laser-focused" going forward, as Plaintiff's duties already largely encompassed those areas and Plaintiff had proven herself competent in those areas. Mr. Rush responded in one word: "no." In fact, Plaintiff was never invited or permitted to apply for any of the "new" positions.

51.     Mr. Rush handed Plaintiff a folder containing a document titled "Separation Agreement and Release of Claims." The document offered Plaintiff a small severance payment that overlooked her years of dedicated service to CultureSource in return for a release of claims and other terms. Mr. Rush attempted to intimidate and coerce Plaintiff into waiving her claims against CultureSource and CoStaff by telling Plaintiff that the Separation Agreement and Release of Claims would become effective in seven days *even if Plaintiff did not sign it*.

52.     The Separation Agreement and Release of Claims defines "Employer," a term used throughout the document, as both CultureSource and CoStaff.

53.     Plaintiff's discharge paperwork bears only the CoStaff logo.

54.     Mr. Rush's articulated reason for eliminating Plaintiff's position – that Plaintiff "does too much" – is not the true reason that Plaintiff's employment was terminated and is implausible on its face.

55.     Mr. Rush never asked Plaintiff to do *less* work.

56.     CultureSource and CoStaff terminated Plaintiff's employment, and failed to consider her for one of the new positions subsequently created, because Mr. Rush knew that Plaintiff was either pregnant or intended to become pregnant based on the nature and substance of Plaintiff's complaint about, and opposition to, the New Leave Policy in the New Handbook on July 19, 2019. In particular, Plaintiff specifically told Mr. Rush that the policy is not inclusive of women employees who would need to take medical leave due to pregnancy and childbirth. Given Plaintiff's known family circumstances at the time (recently married) and age bracket (lower thirties), it was evident that the concern raised was personal.

57.     CultureSource and CoStaff terminated Plaintiff's employment, and failed to consider her for one of the new positions being created, because Plaintiff complained that the New Leave Policy in the New Handbook disproportionally negatively impacts, and excludes, women employees and employees who have a serious illness or disability that prevents them from working.

58.     CultureSource and CoStaff terminated Plaintiff's employment, and failed to consider her for one of the new positions being created, because Plaintiff

complained about, and opposed, a policy that she reasonably believed violates the FMLA – specifically, the provisions codified at 29 U.S.C. § 2614(c)(1) and 29 C.F.R. § 825.100(b).

59.    Following her unlawful discharge, Plaintiff received no information concerning the continuation of her health insurance benefits, as required by COBRA. Plaintiff's employment was terminated on August 28, 2019. Unbeknownst to her, Plaintiff's medical insurance coverage lapsed three days later at the end of the month, yet CultureSource and CoStaff did not inform Plaintiff of that fact. CultureSource and CoStaff left a pregnant, abruptly and unlawfully terminated former employee with no medical insurance without informing her.

60.    Plaintiff inquired about the status of her health insurance coverage on September 5, 2019, and was told by a CoStaff employee on September 6, 2019 that she had been without medical insurance since August 31, 2019, and that COBRA coverage was unavailable to her.

61.    Following her discharge, Plaintiff's job duties were distributed to (1) an existing male employee, (2) existing non-pregnant female employees, as well as (3) two employees who were hired after Plaintiff's discharge, who, upon information and belief, were not pregnant. For instance, prior to her discharge, Plaintiff had been preparing for the Mural Arts conference in Philadelphia, Pennsylvania that took place the week after Plaintiff's employment was terminated. Plaintiff was scheduled

to speak at the conference and had prepared a PowerPoint presentation. Mr. Rush sent a male employee to the conference to present the PowerPoint presentation that Plaintiff prepared.

62.     Plaintiff submitted a timely Charge of Discrimination to the Equal Employment Opportunity Commission (EEOC), and received a right-to-sue letter on June 9, 2020. This lawsuit was filed within 90 days of Plaintiff's receipt of the right-to-sue letter.

63.     In their communication to the EEOC, CultureSource and CoStaff admitted that they jointly employed Plaintiff. However, CultureSource and CoStaff disavowed Title VII in their communication to the EEOC, arguing that they need not comply with Title VII's anti-discrimination and anti-retaliation provisions because they do not constitute a Title VII "employer," as CultureSource does not by itself have fifteen or more employees. *See* 42 U.S.C. § 2000e(b). CultureSource and CoStaff argued to the EEOC that no CoStaff employees should be counted for purposes of determining whether Title VII's numerical threshold is met.

64.     Following Plaintiff's discharge, Plaintiff's attorney requested a copy of Plaintiff's personnel record from CultureSource and CoStaff. Plaintiff's personnel record was subsequently provided by CoStaff, accompanied by a cover letter written on CoStaff letterhead and signed solely by "CoStaff H.R. Services."

## COUNT I
## RETALIATION IN VIOLATION OF TITLE VII

65.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

66.     This Count is asserted against Defendants CultureSource and CoStaff only.

67.     Plaintiff was an "employee" and Defendants CultureSource and CoStaff were her "employer" within the meaning of Title VII.

68.     Plaintiff engaged in activity protected by Title VII when, on July 19, 2019, she complained to Mr. Rush about, and opposed, the provision in the New Handbook eliminating employer-paid health insurance for employees while they are on medical leave by conveying to Mr. Rush that the policy disproportionally adversely impacts and excludes women employees who need to take medical leave due to pregnancy and childbirth.

69.     Approximately six weeks later, CultureSource and CoStaff terminated Plaintiff's employment, and failed to consider her or even permit her to apply for one of the new positions being created, because of Plaintiff's protected activity. Plaintiff's protected activity was a significant factor in the decision to terminate her employment.

70.     Defendants CultureSource and CoStaff cannot escape Title VII liability on the ground that they did not constitute a covered "employer" within the meaning of Title VII due to the size of their workforce because together they have fifteen or

more employees. CultureSource and CoStaff constitute an integrated enterprise and/or joint employer, such that employees of CultureSource and CoStaff are aggregated to determine whether Title VII's numerical threshold is met, because of the following (among other potential unknown facts that may be revealed in discovery):

     a.    CoStaff and CultureSource hold themselves out as one company because they define both entities as "the Company" in both the Old Handbook and the New Handbook and, when the term "the Company" is not used to describe the identity of the employer, repeatedly refer to the identity of the employer as "CultureSource/CoStaff" followed by the word "is" – as opposed to the plural, "are" – suggesting that CultureSource and CoStaff consider themselves one entity.

     b.    Plaintiff's onboarding paperwork bears only the CoStaff logo and not the CultureSource logo.

     c.    Plaintiff's benefits paperwork directs Plaintiff to call CoStaff with any questions.

     d.    A tax form identifies Plaintiff's employer as solely CoStaff.

     e.    Throughout her employment, CoStaff was the sole entity that direct-deposited Plaintiff's salary into her bank account.

f.     CultureSource and CoStaff admitted in their correspondence to the EEOC that they co-employed Plaintiff.

g.     The Client Services Agreement explicitly defines the employer as both CultureSource and CoStaff.

h.     CoStaff serves as CultureSource's human resources department.

i.     CoStaff has a contractual "independent right" to terminate CultureSource employees "without direction or request from" CultureSource.

j.     The Old and New Handbooks bear the logo of both CoStaff and CultureSource on the cover pages and welcome employees to both CoStaff and CultureSource. The introductory pages are co-signed by both CoStaff's CEO and CultureSource's Executive Director.

k.     The Old and New Handbooks expressly define "the Company," a term used throughout the Handbooks, as both CoStaff and CultureSource.

l.     The CEO of CoStaff has the authority to unilaterally amend the policies and procedures contained in the Old and New Handbooks.

m.     Upon information and belief, CoStaff took the lead on drafting the Old and New Handbooks, which contain the workplace policies and procedures applicable to employees. Mr. Rush stated in his July 3, 2019 memo to staff that he had "been meeting with CoStaff to update our staff handbook" since "early-May."

21

n.      The Separation Agreement and Release of Claims that Mr. Rush gave to Plaintiff upon her discharge defines "Employer," a term used throughout the document, as both CultureSource and CoStaff.

o.      Plaintiff's discharge paperwork bears solely the CoStaff logo.

p.      Upon information and belief, CoStaff determined that Plaintiff was not entitled to COBRA benefits. An employee of CoStaff informed Plaintiff of that decision.

q.      Upon information and belief, CoStaff maintained Plaintiff's personnel file and maintains the personnel files of all Worksite Employees. Plaintiff's personnel file was provided to her following her discharge by CoStaff accompanied by a cover letter from CoStaff on CoStaff letterhead.

71.     As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages, including, but not limited to, loss of past and future income and employee benefits, mental anxiety, emotional distress, outrage, humiliation, and embarrassment.

72.     Defendants CultureSource and CoStaff violated Title VII willfully and maliciously.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants CultureSource and CoStaff, jointly and severally, in whatever

amount is shown to be established by the proofs in this cause, together with punitive damages, interest, costs, and reasonable attorney fees.

## COUNT II
## RETALIATION IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT ("ELCRA")

73.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

74.     This Count is asserted against Defendants CultureSource, CoStaff, and Rush.

75.     At all times relevant, Plaintiff and Defendants CultureSource, CoStaff, and Rush were "persons" within the meaning of ELCRA. Mich. Comp. Laws §§ 37.2103(g), 37.2701(a). In addition, CultureSource and CoStaff were Plaintiff's "employer" within the meaning of ELCRA, which, unlike Title VII, defines "employer" as "a person who has 1 or more employees." *Id.* § 37.2201(a).

76.     Plaintiff opposed a violation of ELCRA when, on July 19, 2019, she complained to Mr. Rush about, and opposed, the provision in the New Handbook eliminating employer-paid health insurance for employees while they are on medical leave by communicating her belief to Mr. Rush that the policy disproportionally negatively impacts, and excludes, women employees who need to take medical leave due to pregnancy and childbirth.

23

77.     Approximately six weeks later, Defendants terminated Plaintiff's employment, and failed to consider her for one of the new positions subsequently created, because of Plaintiff's protected activity.

78.     As a direct and proximate result of such violations of Plaintiff's rights by Defendants CultureSource, CoStaff, and Rush, Plaintiff has suffered damages, including, but not limited to, loss of past and future income and employee benefits, mental anxiety, emotional distress, outrage, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with exemplary damages, interest, costs, and reasonable attorney fees.

## COUNT III
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA")

79.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

80.     This Count is asserted against Defendants CultureSource and CoStaff only.

81.     Plaintiff is an "individual" and Defendants are "persons" within the meaning of the ADA. *See* 42 U.S.C. §§ 12111(7), 12203(a), 2000e(a). In addition, Defendants were Plaintiff's "employer" under the ADA for the reasons stated in

paragraph 70 above. Alternatively, CultureSource and CoStaff voluntarily undertook to comply with the ADA and are estopped from arguing that the ADA does not apply to them because the New Handbook provides that "CultureSource/CoStaff is committed to complying fully with the Americans with Disabilities Act (ADA)," and "is also committed to not discriminating against any qualified employees . . . because they are associated with a person with a disability."

82.    Plaintiff engaged in activity protected by the ADA when, on July 19, 2019, she complained to Mr. Rush about, and opposed, the provision in the New Handbook eliminating employer-paid health insurance for employees while they are on medical leave. Plaintiff believed that the policy discriminates against pregnant, sick, and disabled employees because the policy takes away the most important job benefit afforded to CultureSource employees (i.e., medical benefits that are 100% employer paid) solely because an employee or an employee's close family member has a serious medical condition or disability, including pregnancy. Accordingly, Plaintiff respectfully conveyed to Mr. Rush during the discussion on July 19, 2019 that the New Leave Policy in the New Handbook disproportionally adversely impacts, and excludes, employees who need to take medical leave due to a serious health condition or disability and offered pregnancy and cancer as examples.

83.    Defendants terminated Plaintiff's employment, and failed to consider her for one of the new positions subsequently created, because Plaintiff complained

25

about, and opposed, an employment policy that Plaintiff reasonably and genuinely believed violates the ADA due to its disproportionate adverse impact on temporarily disabled employees and/or employees with disabled immediate family members.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants CultureSource and CoStaff, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with punitive damages, interest, costs, and reasonable attorney fees.

## COUNT IV
## RETALIATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT ("PWDCRA")

84.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

85.     This Count is asserted against Defendants CultureSource and CoStaff only.

86.     At all times relevant, Plaintiff and Defendants CultureSource and CoStaff were "persons" within the meaning of Michigan's PWDCRA. Mich. Comp. Laws §§ 37.1103(g), 37.1602(a). In addition, Defendants were Plaintiff's "employer" under PWDCRA, which defines "employer" as "a person who has 1 or more employees." *Id.* § 37.1201(b).

87.     Plaintiff engaged in protected activity on July 19, 2019, for the reasons stated in paragraph 82.

88.     Approximately six weeks after Plaintiff engaged in protected activity, Defendants CultureSource and CoStaff, acting in concert, terminated Plaintiff's employment, and failed to consider her for one of the new positions subsequently created, because Plaintiff complained about, and opposed, an employment policy that she believed and still believes violates, and does violate, the PWDCRA due to its disproportionate negative impact on, and exclusion of, employees with a disability and/or employees with immediate family members who are disabled.

89.     As a direct and proximate result of such violations of Plaintiff's rights by Defendants CultureSource and CoStaff, Plaintiff has suffered damages, including, but not limited to, loss of past and future income and employee benefits, mental anxiety, emotional distress, outrage, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with interest, costs, and reasonable attorney fees.

## COUNT V
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

90.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

91.     This Count is asserted against Defendants CultureSource and CoStaff only.

92.     Plaintiff's employment was terminated because Mr. Rush either knew that Plaintiff was pregnant, or suspected that Plaintiff was pregnant or would become pregnant, based on the nature and substance of Plaintiff's July 19, 2019 complaint about, and opposition to, an employment policy that she conveyed to Mr. Rush has a disproportionate negative impact on, and excludes, women who take maternity leave.

93.     Mr. Rush harbors animus toward female employees with children and/or childcare obligations.

94.     As a direct and proximate result of such violations of Plaintiff's rights by Defendants CultureSource and CoStaff, Plaintiff has suffered damages, including, but not limited to, loss of past and future income and employee benefits, mental anxiety, emotional distress, outrage, humiliation, and embarrassment.

95.     Defendants CultureSource and CoStaff violated Title VII willfully and maliciously.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants CultureSource and CoStaff, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with punitive damages, interest, costs, and reasonable attorney fees.

## COUNT VI
## SEX DISCRIMINATION IN VIOLATION OF ELCRA

28

96.     Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

97.     This Count is asserted against Defendants CultureSource, CoStaff, and Rush.

98.     As discussed in paragraph 92, Plaintiff's employment was terminated because of her sex.

99.     As a direct and proximate result of such violations of Plaintiff's rights by Defendants CultureSource, CoStaff, and Rush, Plaintiff has suffered damages, including, but not limited to, loss of past and future income and employee benefits, mental anxiety, emotional distress, outrage, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with exemplary damages, interest, costs, and reasonable attorney fees.

## COUNT VII
## RETALIATION IN VIOLATION OF FMLA

100.    Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

101.    This Count is asserted against CultureSource and CoStaff only.

102.    Defendants CultureSource and CoStaff engaged in conduct prohibited under the FMLA by retaliating against Plaintiff for complaining about, and

opposing, a medical leave policy that Plaintiff reasonably believed, and still believes, violates the FMLA. Specifically, the provision in the New Handbook eliminating employer-paid health insurance for employees who take medical leave violates 29 U.S.C. § 2614(c)(1).

103.   As a direct and proximate result of Plaintiff's complaint about, and opposition to, a policy that Plaintiff reasonably and in good faith believed violates the FMLA, Plaintiff's employment with CultureSource and CoStaff was terminated.

104.   As a direct and proximate result of the wrongdoing of CultureSource and CoStaff, Plaintiff has sustained loss of earnings and earning capacity, past and future lost earnings, the value of fringe and retirement benefits, loss of job and career opportunities, damage to her good name and reputation in the community, mental and emotional distress, humiliation and embarrassment, and loss of the enjoyment of the ordinary pleasures of life.

105.   Defendants CultureSource and CoStaff willfully violated the FMLA in that they knew that such conduct was prohibited or acted in reckless disregard of whether such conduct was prohibited.

106.   CultureSource and CoStaff cannot evade liability under the FMLA based on the size of their workforce because a reasonable employee would conclude based on the confusing and conflicting language of the "Family and Medical Leave" policy contained in the Old Handbook that CultureSource and CoStaff voluntarily

complied with the FMLA even if they were not required to do so. At the time Plaintiff engaged in activity protected by the FMLA, Plaintiff had a reasonable expectation on which she relied that FMLA protections would prevent her from being fired for expressing a legitimate concern about a policy that she reasonably and genuinely believed violates the FMLA. CultureSource and CoStaff are equitably estopped from raising ineligibility as a defense to FMLA liability.

107.   In addition, for the reasons stated in paragraph 70, above, and based on the economic realities and all the facts and circumstances surrounding the relationship between CultureSource and CoStaff, CoStaff jointly employed Plaintiff such that CoStaff employees are counted for purposes of determining whether FMLA's numerical threshold is met. *See* 29 C.F.R. § 825.106(b)(2).

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants CultureSource and CoStaff, jointly and severally, in whatever amount is shown to be established by the proofs in this cause, together with liquidated damages, interest, costs, and reasonable attorney fees.

## COUNT VIII
## VIOLATION OF COBRA

108.   Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

109.   Plaintiff participated in the group health insurance plan offered by Defendants CultureSource and CoStaff.

110.   COBRA is an amendment to ERISA that ensures that employees who lose coverage under their company's ERISA plan do not go without health insurance before they can find suitable replacement coverage. Under COBRA, an employer that sponsors a group health insurance plan must offer employees the opportunity to continue their health insurance coverage, at group rates but at their own expense, for at least eighteen months after the occurrence of a qualifying event and notice to the affected employee.

111.   Following the termination of her employment, Plaintiff inquired about continuing her health insurance coverage pursuant to COBRA.

112.   Defendants CultureSource and CoStaff violated COBRA by refusing to extend COBRA benefits to Plaintiff following her discharge and by failing to give her required notice of her COBRA rights.

113.   As a result of Defendant CultureSource and CoStaff's COBRA violation, Plaintiff was deprived of the opportunity to continue her group health insurance coverage.

114.   Upon information and belief, Defendants CultureSource and CoStaff invoked the "small business exception" to deny COBRA coverage to Plaintiff. Under that exception, COBRA does not apply "to any group health plan for any calendar year if all employers maintaining such plan normally employ fewer than 20

32

employees on a typical business day during the preceding calendar year." 29 U.S.C. § 1161(b).

115.   The invocation of the small business exception was erroneous. CultureSource and CoStaff are equitably estopped from invoking the small business exception to defeat COBRA coverage because the New Handbook contains a section discussing COBRA and omits the language in the Old Handbook stating that COBRA coverage is unavailable to CultureSource employees. Instead, the New Handbook discusses COBRA and states that employees "may" be eligible for COBRA while omitting the caveats contained in the Old Handbook that employees are ineligible for COBRA. The New Handbook provides the false impression to employees, particularly vulnerable ones in Plaintiff's shoes who are pregnant and scrambling for medical insurance following an abrupt discharge, that they may rely on COBRA to bridge the gap in health insurance coverage. The New Handbook misled Plaintiff to believe that COBRA coverage would be available to her.

116.   Alternatively, as a purported professional employer organization, CoStaff may be the sponsor of the group health plan offered to CultureSource employees, and for purposes of determining whether the small business exception applies, a court "must consider . . . the number of employees of the plan's sponsor." *Granger v. AAMCO Automatic Transmission, Inc.*, Civil No. 91-2409, 1992 U.S. Dist. LEXIS 14246, at *5 (D.N.J. Sep. 9, 1992). Upon information and belief,

33

CoStaff has more than 20 employees, so the small business exception does not apply. Even if CultureSource, and not CoStaff, is deemed the plan sponsor, discovery into the contractual relationship between CoStaff and CultureSource and/or the terms of the group health plan may reveal additional facts that defeat application of the small business exception. Plaintiff intends to explore these issues in discovery.

WHEREFORE, Plaintiff seeks all statutory legal penalties, costs, and taxes up to the maximum allowed by law, including but not limited to, the statutory daily penalty provided for in COBRA for the failure to provide proper written notice, prejudgment interest, attorney fees, costs and any such other relief this Court or the jury may award.

**COUNT IX**
**BREACH OF CONTRACT**

117. Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

118. On behalf of CultureSource and CoStaff, Mr. Rush promised Plaintiff in January 2019 that she would receive a pay increase.

119. On behalf of CultureSource and CoStaff, Mr. Rush again promised Plaintiff in February 2019 that she would receive a pay increase, and additionally promised Plaintiff that the pay increase, whenever implemented, would be retroactive to January 1, 2019.

120.   CultureSource and CoStaff breached the contract by failing to provide Plaintiff with the promised pay raise, causing damages to Plaintiff.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, in whatever amount is shown to be established by the proofs in this cause.

## COUNT X
## UNJUST ENRICHMENT

121.   Plaintiff repeats and re-alleges each and every paragraph of this Complaint as though fully set forth herein.

122.   This Count is asserted in the alternative to the preceding Count.

123.   CultureSource and CoStaff benefitted from the grant-writing responsibilities that Plaintiff performed, and the many other added responsibilities that Plaintiff had performed since her last pay raise, for which Plaintiff was not compensated. For example, in CultureSource's "2019 Year In Review," CultureSource noted an increase in its revenues from $710,657 in 2018 to $913,581 in 2019 – roughly a $200,000 increase that is largely attributable to Plaintiff's contributions for which she was not compensated, including, but not limited to, her grant-writing work.

124.   CultureSource and CoStaff retained the benefit of Plaintiff's grant-writing work and other additional duties that she performed without compensating her for such work, as promised. Plaintiff's grant-writing work for which she was not

compensated, as promised, directly benefitted CultureSource by increasing its revenue.

125.   It would be inequitable to allow CultureSource and CoStaff to retain the benefit of Plaintiff's work for which she was uncompensated without compensating her for such work.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants, jointly and severally, in whatever amount is shown to be established by the proofs in this cause.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury in this matter for the Counts for which a jury trial is permitted.

Respectfully submitted,

*/s/ Daniel W. Weininger*
Daniel W. Weininger (P75865)
Weininger Law PLLC
17118 Adrian Rd.
Southfield, MI 48075-1948
Tel: (248) 905-1640
E-mail: weiningerlaw@gmail.com

Dated: June 24, 2020